IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAMES ALLEN NUNLEY                                              PLAINTIFF

           v.                          Civil No. 02-5199

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT
OF JUSTICE; DRUG ENFORCEMENT
ADMINISTRATION; OFFICER HALFACRE,
Individually and in his official capacities;
UNKNOWN FEDERAL NARCOTICS AGENT,
Individually and in their official capacities                   DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Before the undersigned for report and recommendation are the defendants' motion to dismiss or in the alternative motion for summary judgment (Doc. 60) and the plaintiff's motion for summary judgment (Doc. 77). This case involves plaintiff's challenge to the administrative forfeiture of a Corvette and three separate lots of cash–$131,574; $1,025; and $1,815. Specifically, plaintiff challenges the adequacy of the notices of forfeiture under the Due Process Clause of the Fifth Amendment.

Following the grant of summary judgment in the defendants' favor, plaintiff appealed to the Court of Appeals for the Eighth Circuit. On appeal, the Eighth Circuit reversed in part and remanded the case for further proceedings before this court, *Nunley v. Department of Justice*, 425 F.3d 1132 (8th Cir. 2005).

On February 14, 2006, the Honorable Jimm Larry Hendren, the United States District Judge to whom this case is assigned, found the defendants had established a rebuttable

-1-

presumption that the mail distribution procedures of the Washington County Detention Center were constitutionally adequate.  (Doc. 55).   It was noted that the burden was on the plaintiff to prove that those procedures were not reasonably calculated to provide notice to a prisoner such as plaintiff at the time in question.  (Doc. 55).   The court also noted there was a second issue as to whether the content of the forfeitures notices was sufficient.  (Doc. 55).[1]

## **BACKGROUND**

On May 12, 2000, Task Force Officers Denny Halfacre, Mark Nelson, and Steven Hulsey meet with a cooperating individual (CI) who told them that for several months James Nunley had been distributing methamphetamine for an interstate Mexican trafficking organization.  The CI indicated Nunley received ten to twenty pound shipments of methamphetamine every four to six weeks.  Nunley then distributed the methamphetamine, collected the money, and saw to it that the money was transported back to either Texas or Mexico.  *Defendants' Exhibit* 1 (hereinafter *Defts' Ex.*), Order entered on defendant's motion to suppress on September 15, 2000, in *United States v. James Allen Nunley*, Cr. No. 00-50025-01.  *See also Plaintiff's Motion for Summary Judgment* (Plff's MSJ, Doc. 77) at page 6.

On May 13, 2000, the CI made a recorded telephone call to Nunley in which the two discussed drug transactions in veiled terms.  *Defts' Ex.* 1 at page 2.  Nunley stated during that call that he was "not out of product yet" and " that he had around a hundred" but had been "too busy

---

[1] Defendants have submitted exhibits with their motion to dismiss or alternative motion for summary judgment (Doc. 60).  They have also chosen to refer back to exhibits submitted with their original summary judgment motion (Doc. 28) and their supplement summary judgment motion (Doc. 36).  This, of course, results in some confusion, since they refer to the exhibits attached to the current motion by numbers, the original motion by numbers, and the supplemental motion by letters of the alphabet.  In an effort to make references to the exhibits as understandable as possible, the court will refer to exhibits attached to the current motion simple by the term "*Defts' Ex.*" followed by the correct number.  All exhibits attached to defendants' supplement to the motion for summary judgment (Doc. 36) will be identified as follows:  Supp. MSJ, Doc. 36 followed by the identification of the appropriate exhibit by letter of the alaphabet.  Exhibits submitted with the original summary judgment motion will be identified as follows:  Orig. MSJ, Doc. 28, followed by the appropriate exhibit numbers.

to count it recently." *Id.*  The officers also heard Nunley state that he had "three guns within easy reach." *Id.*  The CI was sent to the premises to meet with Nunley and attempt to actually see if drugs and large sums of currency were on the premises. *Id.*; *Plff's MSJ* (Doc. 77) at page 6.

After meeting with Nunley, the CI informed the officers that he observed about a quarter pound of methamphetamine and a boot box filled with currency believed by the CI to be approximately $100,000. *Defts' Ex.* 1 at page 2.  The CI reported that Nunley was waiting on a call about a shipment due to arrive that night or the next day and was packing the money in case he had to travel with it to pick up the shipment. *Id.*  The CI also reported that Nunley stated he had to deliver more of the methamphetamine and collect more money that night. *Id.*; *Plff's MSJ* (Doc. 77) at page 6.  The CI told Halfacre that Nunley was "habitually armed" and had said he "will not be taken alive if the police come for him." *Defts' Ex.* 1 at page 2.

After meeting with the CI, an affidavit for search warrant was prepared for the residence of Nunley, 2203A Pin Oak, Springdale, Arkansas. *Defts' Ex.* 1 at pages 2-3.  A nighttime no-knock warrant was requested. *Id.*  The warrant was issued and at approximately 12:05 a.m. the warrant was executed.  Officers seized numerous items including drugs, weapons, records, a Corvette car, and three separate amounts of currency.  Supp. MSJ (Doc. 36), Exhibit G, at page 3; *Plff's MSJ* (Doc. 77) at page 7.

On May 14, 2000, Nunley was arrested and charged with possession of methamphetamine with the intent to distribute.  On May 16, Nunley made a statement confirming his involvement in the trafficking of large quantities of methamphetamine in Northwest Arkansas for an individual in Mexico and sending large sums of cash back to that individual. *Defts' Ex.* 2 at page

-3-

6, Transcript of Detention Hearing held on June 2, 2000, in *United States v. James Allen Nunley*, Cr. No. 00-50025-01.

After his agreement to cooperate, Nunley was released immediately. *Defts' Ex.* 2 at page 6.. He remained free until May 31, 2000, when a criminal complaint was filed against Nunley charging him with possession with intent to distribute methamphetamine. *United States v. Nunley*, Cr. No. 00-50025-01 (Doc. 1). During the period of time Nunley was free, Halfacre indicates he had at least three more conversations with Nunley about the items seized for forfeiture. Supp. MSJ, Doc. 36, Exhibit G, at pages 3-4. Later, Halfacre states he had at least two additional conversations with Nunley at the WCDC regarding the assets. *Id.* Each time, Halfacre asserts he informed Nunley that the assets were undergoing forfeiture and he would have to contest the forfeiture if he wanted the items back. *Id. See also Defts' Ex.* 3 at page 2 (Affidavit of Steven Hulsey–Nunley was told in my presence that all the items were undergoing forfeiture proceedings and he would have to contest the forfeiture and win to get the items back).

Halfacre states they never discussed the boat and he had no idea Nunley was claiming any kind of an interest in the boat. Supp. MSJ, Doc. 36, Exhibit G, at pages 3-4. Halfacre asserts that Nunley never expressed any desire to contest the forfeiture of the money. *Id.* The only item Nunley indicated he had any desire to get back was his Corvette. *Id.*

At the June 2, 2000, detention hearing on cross-examination Nunley said: "I had a job going over on Hiram Springs Road, on that statement that he just read to you all they seized a vet, and that statement came from a comment that was made from the vet because I asked if I could get my vet back, and he said it was bought with drug money, and I said, well, if you're going to look at it that away, everything in the last four –." *Defts' Ex.* 2 at page 17.

-4-

On June 28, 2000, the federal grand jury returned a one count indictment against Nunley charging him with possession with intent to distribute methamphetamine, *United States v. Nunley*, Cr. No. 00-50025-01.  On June 29, 2000, Nunley contacted Nelson and subsequently provided information that led to the seizure of approximately $5,000 in drug proceeds from Debbie Chaffin, Nunley's girlfriend.  Supp. MSJ, Doc. 36, *Exhibit* G at page 5.  Nelson initiated administrative forfeiture of the $5,000 and notice was mailed from the Drug Enforcement Administration (DEA) headquarters.

On August 4, 2000, based on information Nelson received from a CI an additional $10,000 was seized from Kelly Leverich, a friend of Chaffin's.  Supp. MSJ, Doc. 36, *Exhibit* G at page 6.  Hulsey initiated the administrative forfeiture of this currency and notices were mailed from DEA headquarters.  Halfacre and Hulsey advised Nunley at the WCDC that the $10,000 would undergo forfeiture.  Supp. MSJ, Doc. 36, *Exhibit* G, at page 6.

The DEA procedures in effect in June of 2000 called for the sending of notice letters by certified or registered mail to all interested parties listed on the standard seizure form.  *Defts' Ex.* 6.  A copy of the first page of each notice letter was maintained in the appropriate seizure file because the second and third pages contained boilerplate language.  *Id.*  This procedure helped reduce the number of documents contained in a seizure file and the cost of microfilming.  *Id.*

However, the unclaimed correspondence sent to Nunley was opened by the DEA, Consolidated Asset Tracking System (CATS) Office, and contained the three page notice of seizure letters.  *Defts' Ex.* 6.  The notices sent to Nunley contained on page two the following:

If you are indigent (needy and poor) you may not have to post the bond.  To request a wavier of the bond, you must fully disclousure your finances in a signed statement called a "Declaration in Support of Request to Proceed *In Forma Pauperis"* along with a claim of ownership of the property.  Use the format of the

pauperis declaration shown as Form 4 in the Appendix of the Forms following Rule 48 of the Federal Rules of Appellate Procedure or obtain a form from a DEA field office.

*Defts' Ex.* 6 at pages 1, 8, 15, 29, 34, and 52.  *See Plff's MSJ* (Doc. 77) at page 9.

Steven Hulsey initiated the administrative forfeiture of the $131,574.00, the $1,815.00, the 1985 Chevrolet Corvette, and the $1,026.00.  *Defts' Ex.* 3.  Notices on the three amounts of currency were sent by certified mail from DEA headquarters on June 26, 2000.  Notice on the Corvette was sent by certified mail from the DEA headquarters on June 30, 2000.  Supp. MSJ, Doc. 36, Exhibit G, at pages 3-4; Orig. MSJ, Doc. 28, Exhibits 3, 11, 19, and 26.  When he initiated administrative forfeiture of the items and prepared the standard seizure forms for submission to DEA headquarters, Hulsey was unaware of any information suggesting there was any problems with the internal mail delivery system at the WCDC.  *Defts' Ex.* 3 at page 4.  He believed the system for delivery of mail at the WCDC was adequate based on his experience. *Id.*  Hulsey had worked at the WCDC from 1996 until 1997.  *Id.* at page 1.

Asset ID Number 00-DEA-379903 was assigned to the $131,574.00 in United States Currently seized from Nunley on May 14, 2000.  On the day of the seizure, Nunley signed a receipt for $131,574.00.  Orig. MSJ, Doc. 28, Exhibit 61.

Notice of the seizure was sent on June 26, 2000, to the following: (1) Nunley at 2203 Pin Oak A, Springdale, AR 72756.  This notice was returned marked unclaimed.  *Defts' Ex.* 6 at page 2; Orig. MSJ, Doc. 28, *Exhibit* 1 and 2; (2) Nunley at the Washington County Detention Center.  Delivery of this notice was accepted on July 3, 2000, by Shirley Hinds, who is now deceased; *Defts' Ex.* 6 at page 2; Orig. MSJ, Doc. 28*, Exhibits* 4, 20, 27; (3) Debbie Chaffin at the Pin Oak

-6-

address.  Delivery of this notice was accepted by Chaffin.  *Defts' Ex.* 6 at page 3; Orig. MSJ, Doc. 28, *Exhibits* 5 and 6.

On July 10, July 17, and July 24, 2000, notice of the forfeiture was published in the Wall Street Journal.  Orig. MSJ, Doc. 28, *Exhibit* 7. On September 21, 2000, after no claims had been received, the DEA administratively forfeited the $131,574.00.  *Defendants' Exhibit* 8.

Asset ID Number 00-DEA-380001 was assigned to the $1,026.00 in United States Currency that was seized from Nunley on May 14, 2000.  On the day the money was seized, Nunley signed a receipt for the $1,026.00.  Orig. MSJ, Doc. 28, *Exhibit* 62.

Notice of the seizure was sent on June 26, 2000, to the following: (1) Nunley at 2203 Pin Oak A, Springdale, AR 72756.  Delivery of this notice was accepted by Chaffin.  *Defts' Ex.* 6 at page 3; Orig. MSJ, Doc. 28, *Exhibits* 17 and 18; (2) Nunley at the Washington County Detention Center.  Delivery of this notice was accepted on July 3, 2000, by Shirley Hinds. *Defts' Ex.* 6 at page 3; Orig. MSJ, Doc. 28, *Exhibits* 19 and 20; (3) Debbie Chaffin at the Pin Oak address. Delivery of this notice was accepted by Chaffin.  *Defendants' Exhibit* 21 and 22.

On July 10, July 17, and July 24, 2000, notice of the forfeiture was published in the Wall Street Journal. *Defendants' Exhibit 5.*  On September 1, 2000, after no claims had been received, the DEA administratively forfeited the $1,026.00.  *Defendants' Exhibit* 23.

Asset ID Number 00-DEA-380004 was assigned to the $1,815.00 in United States Currency that was seized from Nunley on May 14, 2000.  Notice of the seizure was sent on June 26, 2000, to the following: (1) Nunley at 2203 Pin Oak A, Springdale, AR 72756.  This notice was returned marked unclaimed.  *Defts' Ex.* 6 at page 3; Orig. MSJ, Doc. 28, *Exhibits* 24 and 25; (2) Nunley at the Washington County Detention Center.  Delivery of this notice was accepted by

-7-

Shirley Hinds on July 3, 2000. *Defts' Ex.* 6 at page 2; Orig. MSJ, Doc. 28, *Exhibits* 26 and 27;

(3) Debbie Chaffin at the Pin Oak address. Delivery of this notice was accepted by Chaffin.

*Defts' Ex.* 6 at page 2; Orig. MSJ, Doc. 28, *Exhibits* 28 and 29.

On July 10, July 17, and July 24, 2000, notice of the forfeiture was published in the Wall

Street Journal. *Defendants' Exhibit* 5. On September 1, 2000, after no claims had been received,

the DEA administratively forfeited the $1,815.00. *Defendants' Exhibit* 30.

Asset ID Number 00-DEA-379908 was assigned to a 1985 Chevrolet Corvette automobile

that was seized from Nunley on May 14, 2000. Notice of the seizure was sent on June 30, 2000,

to the following: (1) Nunley at 2203 Pin Oak A, Springdale, AR 72756. This notice was returned

marked unclaimed. *Defts' Ex.* 6 at page 5; Orig. MSJ, Doc. 28, *Exhibits* 9 and 10; (2) Nunley

at the Washington County Detention Center. Delivery of this notice was accepted by Barbara

Stidham, a Washington County Sheriff's Office employee who was not assigned to the detention

center. *Defts' Ex.* 6 at pages 3-4; Orig. MSJ, Doc. 28, *Exhibits* 11, 12; (3) Debbie Chaffin at the

Pin Oak address. This notice was returned marked unclaimed. *Defts' Ex.* 6 at page 4; Orig.

MSJ, Doc. 28, *Exhibits* 13 and 14. On July 17, July 24, and July 31, 2000, notice of the

forfeiture was published in the Wall Street Journal. Orig. MSJ, Doc. 28, *Defendants' Exhibit* 15.

On August 18, 2000, a superseding indictment was returned against Nunley charging that

on or about May 13, 2000, Nunley knowingly possessed with intent to distribute more than 500

grams of a mixture containing a detectable amount of methamphetamine, a Schedule II controlled

substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(iii), *United States v. Nunley*, Cr.

No. 00-50025-01.

From 1998 to October 2000, Barbara Stidham was the receptionist/secretary for the criminal investigation division of the Washington County Sheriff's Office (WCSO). *Defts' Ex.* 4 at page 1. As part of her duties, she received and sorted incoming mail. *Id.* As a result of her duties, she is familiar with the mail distribution policy for the WCSO during 2000. *Id.*

Stidham would sign for any certified mail, unless it was restricted delivery, which had to be signed by the inmate. *Defts' Ex.* 4 at page 1. If Stidham was not available, Shirley Hinds, the Sheriff's Secretary, handled the mail. *Id.* Hinds is now deceased. *Id.*

Stidham would sort the mail by department and then call the Washington County Detention Center (WCDC) for a detention officer to pick up the mail for inmates at the WCDC, including certified mail. *Defts' Ex.* 4 at page 2. Stidham is not familiar with how the mail is distributed once it is taken to the WCDC. *Id.* Stidham recognizes her signature on the one receipt for certified mail for Nunley and asserts without hesitation that it is Hinds' signature on the other three receipts. *Id.*

Randall Denzer has worked for the WCSO for twenty-five years and has been assigned to the WCDC since 1991. *Defts' Ex.* 5 at page 1. In 2000, he was a Lieutenant and since 2005 has been administrator. *Id.* He is familiar with the mail distribution policy for the WCSO and the WCDC during 2000. *Id.*

All mail was delivered by the postal service to Stidham who would sign for any certified mail, unless it was restricted delivery, which had to be signed by the inmate. *Defts' Ex.* 5 at page 1. If Stidham was not available, Hinds, would perform those duties. *Id.*

AO72A
(Rev. 8/82)

The WCSO and the WCDC were separate buildings located about fifty feet apart. *Defts'*
*Ex.* 5 at page 2. Once the mail was sorted by departments, a detention officer would pick up mail
for inmates in the WCDC.  *Id.*

The time a detention officer picked up mail for the inmates varied daily and could range
anywhere from 10:00 a.m. to 4:00 p.m.  *Plaintiff's Exhibit* 2 (Doc. 79) at page 5.  No specific
detention officer was assigned to pick up the mail.  *Id.*

The records for 2000 no longer exist so it can not be determined what detention officers
picked up, logged in, and distributed the mail.  *Plaintiff's Exhibit* 2 (Doc. 79) at page 5.  For this
same reason, it cannot be determined if notices of forfeiture were sent by the DEA to other
inmates of the WCDC between January and December of 2000.  *Id.*

Once at the WCDC, the mail was distributed to inmates pursuant to a mail distribution
policy. *Defts' Ex.* 5 at page 2.  With regard to the distribution of incoming mail, the WCDC mail
policy provides:

> Incoming mail shall be held only so long as is necessary for inspection or for
> reading where there is sufficient compelling reason to do so.  In no case shall it
> be held longer than twenty-four (24) hours, excluding weekends, or holidays.
>
> Distribution of incoming mail shall be done by a detention officer, directly to the
> receiving detainee's hand.
>
> Note:  At no time shall the mail be distributed by a detainee.  Nor shall mail be
> dropped on a table or other convenient place for each detainee to come and look
> for his own.

Supp. MSJ, Doc. 36, Exhibit F, ¶ 2.

Mail for inmates was to be logged into the computer by the detention officer who
delivered the mail. *Defts' Ex.* 5 at page 2.  Mail was opened in front of the inmate.  *Id.*  Normally
mail was passed out after dinner.  *Id.*

-10-

Denzer reviewed the inmate mail history for Nunley, Supp. MSJ (Doc. 36), Exhibit B. *Defts' Ex.* 5 at page 2. He discovered only two certified letters dated August 14, 2000, and September 1, 2000, were logged into the computer. *Id.* Denzer asserts that he researched the records and has no explanation for why the other certified letters were not logged into the computer other than perhaps the detention officer who delivered the mail got busy with other duties and failed to log in the mail. *Id.* However, Denzer states he has no reason to believe that the certified mail was not delivered to Nunley on or about July 3, 2000, July 18, 2000, August 7, 2000, August 14, 2000, and September 1, 2000, in accordance with routine practice. *Id.*

Denzer knows of only one other lawsuit were an inmate complained about not receiving his mail at the WCDC, *Setzke v. Fern*, Civil No. 04-5064. *Defts' Ex.* 5 at page 3. Defendant was granted summary judgment in that case.

On September 1, 2000, after no claims had been received, the DEA administratively forfeited the 1985 Chevrolet Corvette, the $1,026, and the $1,815. Orig. MSJ, Doc. 28, *Defendants' Exhibit* 16.

On September 8, 2000, Nunley filed a motion to suppress evidence. *United States v. Nunley*, Cr. No. 00-50025-01 (Doc. 30). He asked that all evidence obtained in the search of his house on May 14th be suppressed. *Id.* A suppression hearing was held on September 14, 2000, and on September 15th, the motion was denied. *Defts' Ex.* 1.

On September 21, 2000, Nunley entered a conditional plea of guilty to the superseding indictment reserving the right to appeal the denial of his motion to suppress. *United States v. Nunley*, Cr. No. 00-50025-01 (Doc. 39). On September 21, 2000, after no claims had been

-11-

AO72A
(Rev. 8/82)

received, the DEA administratively forfeited the $131,574.  Orig. MSJ, Doc. 28, *Defendants'*

*Exhibit* 8.

Nunley reported no assets or source of income in the pre-sentence report.  *United States*

*v. Nunley*, Cr. No. 00-50025-01 (Doc. 42).  Nunley was sentenced to a term of imprisonment of

324 months on December 19, 2000.  *Id.* at (Doc. 43).

## DISCUSSION

Defendants have moved for summary judgment arguing:  (1) the complaint fails to state

facts constituting a claim against Halfacre; (2) Halfacre is protected from suit by qualified

immunity; (3) the content of the DEA notices is constitutionally adequate; and (4) the notice

procedures, including the use of the internal mail delivery system at the WCDC, meet the

requirements of due process.

Nunley maintains he should be granted summary judgment because the defendants failed

to determine whether the WCDC mail procedures were reasonably calculated to provide notice

to him before they sent the forfeiture notices to him there.  He also contends the procedures were

in fact not adequate as is illustrated by the fact that the certified mailings were not logged in and

he did not receive notice of the forfeitures.  Finally, Nunley argues the notices that he received

did not afford him due process because they did not state an indigent did not need to post a bond

to contest the forfeiture.

First, we address the defendants' argument that no claim is stated against Halfacre.

Defendants argue Halfacre cannot be held liable for the administrative forfeiture or the notices

sent because he did not initiate the forfeiture of the assets or send the notices.  We agree.  While

Halfacre was involved in the seizure of the assets, the facts are undisputed that the administrative

-12-

forfeitures of the assets at issue were initiated by Hulsey and Nelson and the notices of forfeiture were sent from DEA headquarters. Halfacre played no role in the forfeiture, in the manner used to notify Nunley of the potential forfeiture, or in the ultimate forfeiture. *See e.g., Tallman v. Reagan,* 846 F.2d 494, 495 (8th Cir. 1988)("Only federal officials who participate in alleged violations are subject to a *Bivens*-type suit."). Moreover, even if we were to hold a claim is stated against Halfacre, he would be entitled to summary judgment in his favor for the reasons discussed below.

Second, we address the issue of whether the content of the seizure notices was constitutionally valid. Nunley argues that the content of the notices of forfeiture were insufficient because they did not state that an indigent need not post a bond to contest a forfeiture.

We reject Nunley's claim. The copies of the forfeiture notices sent to Nunley at the Pin Oak address and/or the WCDC address that were returned to the DEA were opened at the CATS office and by affidavit Dorothy Floyd, *Defts' Ex.* 6, asserts that each contains the language, quoted above, that specifically informed Nunley if he was indigent (needy and poor) he could request a waiver of the bond requirement. Moreover, Nunley in his own history of the case, states that the "notices sent out at the times relevant in the instant lawsuit contained information concerning indigency and how to obtain a forma pauperis affidavit intended to file a claim upon the seized property." *Plff's MSJ* (Doc. 77) at page 9.[2]

---

[2]At page 26 of his motion for summary judgment (Doc. 77), Nunley states the contents of the notice fail to include a provision which informs a recipient of how to file a bond exemption, where such exemption must be filed, and to whom the exemption must be addressed. Nunley did not previously make this argument. However, the notices contain a heading "where to submit correspondence" which states that except as noted above, all other documents must be submitted to the DEA at an address that is provided. *Defts' Ex.* 6 at page 10.

Finally, we turn to the method used to send notice to Nunley.  The property was seized by the DEA pursuant to 21 U.S.C. § 881 because it was used or acquired as a result of a drug-related offense.  The DEA initiated the forfeiture proceedings under 19 U.S.C. § 1607(a) which requires the  government to send a written notice of the seizure and forfeiture proceeding to each party who may have an interest in the seized property and to publish notice of the seizure and its intent to forfeit the property in a newspaper of general circulation in the judicial district in which the forfeiture proceeding is brought once a week for three consecutive weeks.

"The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law'" *Dusenberry v. United States*, 534 U.S. 161, 167. 122 S. Ct. 694, 151 L. Ed. 2d 597 (2002).  Due process requires that persons whose interests are at stake be given notice and an opportunity to be heard.  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950).

In *Mullane*, the Supreme Court said: "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314.  It stated that "[t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane*, 339 U.S. at 318.

The fact that Nunley was incarcerated is critical in determining whether the notice given was adequate.  In *Robinson v. Hanrahan*, 409 U.S. 38, 93 S. Ct. 30, 34 L. Ed. 2d 47 (1972), the Supreme Court held that notice mailed to a prisoner's home address by the state in whose

-14-

custody he was held failed to meet the standard set forth in *Mullane*.  In *Dusenbery v. United States*, 534 U.S. 161, 122 S. Ct. 694, 151 L. Ed. 2d 694 (2002), the Supreme Court addressed the issue of the adequacy of notice of forfeiture to an incarcerated individual and held that actual notice was not required.

In the *Dusenbery* case, the Federal Bureau of Investigation (FBI) instituted administrative forfeiture proceedings on currency that was seized when a search warrant was executed at the residence where Dusenbery was arrested.  *Dusenbery*, 122 S. Ct. at 695-696.   At the time the forfeiture proceedings were instituted, Dusenbery was in prison on federal drug charges.  *Id.*

The FBI sent notice by certified mail to the federal correctional institution where Dusenbery was incarcerated, to the residence where he was arrested, and to an address in the town where his mother lived.  *Id.* at 696.  It also placed notice in three consecutive Sunday editions of a paper in general circulation in the judicial district in which the forfeiture proceeding was brought.  *Id.* at 698.  No response to the notices was received by the FBI and the money was turned over to the United States Marshals Service.  *Id.*  at 696.

At the district court level, evidence was introduced concerning the handling of inmate mail at the institution where Dusenbery was incarcerated at the time the administrative forfeiture proceedings were underway.  *Dusenbery*, 122 S. Ct. at 698.  Specifically, James Lawson, an inmate systems officer, by affidavit asserted that he signed for the certified mail containing the FBI's notice to Dusenbery about the cash.  *Id.*  Lawson also testified about the procedure used for "accepting, logging, and delivering certified mail addressed to inmates."  *Id.*  Lawson indicated he would log the mail in, Dusenbery's unit team would sign for it, and it would then be given to Dusenbery.  *Id.*  A paper trail no longer existed because at the time logbooks were

-15-

only maintained for one year.  *Id.*  The lower courts found that sending the notice by certified mail to his place of incarceration satisfied his due process rights.  *Id.*  The Supreme Court agreed. *Id.*

The Court rejected the argument that actual notice was required.  *Dusenbery*, 122 S. Ct. at 801.  In doing so it noted that it had "allowed the Government to defend the 'reasonableness and hence the constitutional validity of any chosen method . . . on the ground that it is in itself reasonably certain to inform those affected.'"  *Id.* (citation omitted).

It held the government had carried its burden of showing the following procedures had been used to give notice:

> The FBI sent certified mail addressed to the petitioner at the correctional facility where he was incarcerated.  At that facility, prison mailroom staff traveled to the city post office every day to obtain all the mail for the institution, including inmate mail.  The staff signed for all certified mail before leaving the post office. Once the mail was transported back to the facility, certified mail was entered in a logbook maintained in the mailroom.  A member of the inmate's Unit Team then signed for the certified mail to acknowledge its receipt before removing it from the mailroom, and either a Unit Team member or another staff member distributed the mail to the inmate during the institutional's "mail call."

*Id.*, 122 S. Ct. at 700.

The Court rejected Dusenbery's argument that since he was at a federal facility at the time of the forfeiture the FBI could have made arrangements for the Bureau of Prisons to assure delivery of the notice to him.  *Id.*, 122 S. Ct. at 701.  The Court held that "the Due Process Clause does not require such heroic efforts by the Government; it requires only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action; '[t]he criterion is not the possibility of conceivable injury but the just and reasonable character of the requirements.'"  *Id.* (citation omitted).  It concluded use of the mail was acceptable and the

-16-

remaining portion of the delivery, *i.e.* the mail delivery procedures at the facility detailed in that case, was "'reasonably calculated, under all the circumstances, to apprise [petitioner] of the pendency of the action.'" *Id.*, 122 S. Ct. at 702.  It held that due process required no more.  *Id.*

In this case, the Eighth Circuit held that there was no presumption that "notice sent by mail to the institution in which the addressee-prisoner is housed satisfies the due process clause" because "prison mail must navigate a second mail-distribution system."  *Nunley v. Department of Justice*, 425 F.3d 1132, 1137 (8th Cir. 2005).  While there was "no irrebuttable presumption that a prison's internal mail-distribution procedures are reasonably calculated to provide notice," the court held that the "prisoner, as the plaintiff, has the burden to demonstrate that the procedures are inadequate."  *Id.*

Nunley maintains defendants are not entitled to summary judgment because they failed to inquire into the mail distribution policy at the WCDC prior to the mailing of the forfeiture notices.  *Plff's MSJ* (Doc. 77) at page 7 & 19.  Therefore, he maintains they had no way of knowing if the procedures were adequate enough to form a reasonable belief that it would be likely the notices would be delivered to him.  *Id.*  Nunley also argues this court erred when it held on February 14, 2006, based on the evidentiary submissions before it, that the defendants had established a "rebuttable presumption that the mail distribution procedures of the Washington County Detention Center are constitutionally adequate."  Order entered February 14, 2006 (Doc. 55).

We find the defendants are entitled to summary judgment in their favor.  We believe defendants have established that the procedures were reasonably calculated to provide notice to Nunley.  Each notice was sent by certified mail addressed to Nunley at the facility he was

-17-

incarcerated in.  The certified mail was delivered each day by the United States Postal Service to Stidham, or Hinds in Stidham's absence.  The certified mail was signed for.  The mail was then divided by departments.  Once divided by departments, mail for inmates was picked up by a detention officer for the WCDC.

The WCDC and the WCSO were located approximately fifty feet apart from each other in separate buildings.  Once in the possession of the WCDC, the mail was delivered to the inmates by detention officers, not by trustees, other inmates, or other personnel.  The mail was delivered directly into the hands of the inmates.  Mail was opened in front of the inmates.  The mail was normally passed out after dinner each day.

Mail for an inmate was to be logged into the computer by the detention officer who delivered the mail.  Although the mail log appears to have some inaccuracies, since it does not show all certified mail received at the WCDC for Nunley, the inaccuracies in the log do not establish that the mail was not delivered to Nunley.  Nor do the inaccuracies in the log suggest that the mail distribution procedures themselves are not reasonably calculated to provide notice.

The Due Process Clause does not require the government to undertake heroic efforts to ensure that notice is delivered to an inmate.  Nor would the fact that Nunley did not actually receive the pieces of mail at issue mean that the method used was not reasonably calculated, under all of the circumstances, to provide notice.

Nunley also presents the argument that the mail procedures are inadequate because the written mail policy does not define privileged mail to include mail from law enforcement agencies such as the DEA.  *Plff's MSJ* (Doc. 77) at pages 20-21.  He therefore contends the mail can be opened outside the presence of the inmate and inspected.  *Id.* at page 21.  If a staff

-18-

member believes all monies seized in a drug sting should be forfeited, or is biased against an inmate for any reason, Nunley states the staff member can interfere with the inmate's mail. *Id.* By way of example, Nunley suggests a staff member could make sure an inmate never receives any notices of forfeiture. *Id.* Nunley maintains this possibility makes the WCDC mail policy inadequate.

Nunley has not previously raised this issue. This case is on remand to this court on two specific issues. The adequacy of the mail distribution procedures and the adequacy of the content of the notice. Nunley has not previously addressed the failure of the written mail policy to classify notices of forfeiture as privileged or legal mail or the propriety of mail being opened outside his presence.

We therefore decline to address this issue. Moreover, we note that Nunley is engaged in pure speculation and conjecture without any factual basis or any relation to the issue of whether the notices sent in this case were reasonably calculated, under all circumstances, to apprise him of the pendency of the forfeiture action and afford him the opportunity to contest the forfeiture.

<u>CONCLUSION</u>

For the reasons stated, I recommend that the plaintiff's motion for summary judgment be denied and the defendants' motion for summary judgment be granted.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are**

-19-

reminded that objections must be both timely and specific to trigger de novo review by the

district court.

DATED this 8th day of January 2007.


/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-20-